Case number 23-1702 Steven Gillman v. City of Troy MI et al. Oral argument not to exceed 15 minutes per side. Margaret Debler for the appellant. You may proceed. Thank you. May it please the Court, Margaret Debler here on behalf of defendant appellant Julie Green Hernandez. I would like to reserve three minutes for rebuttal. As an initial and preparatory matter, public service aide Julie Green Hernandez notes that this court requested supplemental briefing on the issue of jurisdiction. And she reiterates that this court has jurisdiction to hear this appeal because defendant can, as she must, accept the record supported facts adopted by the district court and should prevail using those facts. She can show that established law existing at the time of the incident, on July 19th of 2020, did not put her on notice that she violated the 14th amendment. The district, yes? Can I ask, because I was looking at your supplemental briefing and I noticed in your briefing you're pretty upfront about conceding the facts. And then you went through and explained the facts and it didn't seem like a concession. Okay, and that's fair. What we actually did was we recognized that we have to concede the district court's adopted facts for the purposes of this Qualified Immunity Appeal. But I guess our position is that they have to be record supported facts. And to the extent that there is video, that blatantly contradicts those facts. What video here? I saw a lot of video of the floor. Okay. What video here contradicts what the district court found? The district court accepted the fact that the plaintiff's submission that my client observed that the decedent, Ms. Miller, had vomited numerous times. And that is just not depicted on the video. And it's also not depicted on the video. That's correct. Your client was deposed and said she knew that Ms. Miller had been vomiting over a course of days. And she saw, maybe she didn't see the vomiting happen, but she saw the vomiting on the floor. So she testified to all that. So my client testified that she was advised when she came on shift that day, day three, that Ms. Miller was withdrawing from heroin, that she had vomited. I vomited singular. No, that she had vomited. I had been vomiting continuously. Well, no, she was not advised. So you're not conceding that your client, based on the record in the district court's founding, you're not conceding for the purposes of appeal that your client knew over the course of these days that Ms. Miller had been continuously vomiting. Yes, because there's... Yes, you are conceding it for the purpose of appeal. No, I'm not. You're not. Because there's no record supported evidence of that. And it has to... But the evidence that the other PSAs told her, the evidence in the record that she read what happened when came in, we're supposed to discard all that and reject what the district court found. Your Honor, there is no evidence in the record that the other PSAs told her that Ms. Miller had been vomiting repeatedly over the course of days. There's no evidence in the record of that. There's no evidence in the record that she witnessed one of the other PSAs tell the supervisor, the sworn officer, that, you know, this person has been vomiting, this person has been... No, there isn't. There isn't. What happened was there was a laudermill hearing and there was hearsay on the notice by some administrative assistant about some... about charging her with having known that Ms. Miller vomited over days. When Sgt. Giolatti was actually deposed, he admitted that no one ever told him that Ms... About LaMilza. No, about... that no one ever told him that... We're not talking about him. We're asking what your client knew. Right. And no one ever told Sgt. Giolatti during the investigation that my client knew that Ms. Miller was consistently vomiting over the course of days. That's just not the case. And Sgt. LaMilza came in that morning. He observed Ms. Miller sleeping. He did not, you know, change any kind of protocols with respect to her care. If anything... Moving past the vomiting, we have a couple purported cell checks that weren't recorded. Correct. Because district court did not, you know, said, you know, we don't have to accept the testimony, right, of just one party on this. The jury gets to decide credibility. They're not even recorded. Would you concede just for the purposes of appeal and for our jurisdiction that those cell checks didn't happen? Yes.  What about the fact that... what about confirming consciousness? Would you agree just, again, for the purposes of appeal, that your client never saw Ms. Miller's foot move? No. Okay. Because she testified that she did see the foot move. And there's no countervailing testimony to dispute that. And what I think is really important here is that we go back to the farmer test. And the farmer test, based on, you know, the Lawler decision, requires two things. It requires proof of a sufficiently serious medical need and proof that the defendant actually recognized that need and consciously disregarded it. And in this situation, two serious medical needs are being advanced, as far as I can tell from the plaintiff's briefing. One is that heroin withdrawal with vomiting and accepting that there was vomiting over the course of days. Do you agree that there's a serious medical need here, that that's been said? No, I don't. I don't. Because I think it's important for what we're taught in terms of a qualified immunity analysis, is that the whitening asserted can't be viewed in a generalized sense. It has to be viewed in a particularized sense. And in this situation, on July 19th of 2020, there was nothing in the existing case law that would have put Ms. Green-Hernandez on notice that even if she knew that there was, that Ms. Miller had vomited multiple times over the course of days. And she knew that this vomiting was associated with heroin withdrawal because she'd been told about the heroin withdrawal. And she knew that the concern with heroin withdrawal is that you don't want the individual to become dehydrated or malnourished. And she knew that Ms. Miller was not dehydrated and was not malnourished because she saw the empty wrappers, she saw the empty bottles, she in fact gave her more food and more to drink. Can you explain how this case is different than Burwell? How this case is different than Burwell? Yes. Yes, I think this case is very different because of the circumstances. There's nothing in this case that suggests that there was, there's everything to suggest that the vomiting was due to mild heroin withdrawal. And not anything else. And so, and we have, our expert's affidavit is unrefuted on this point too. That this was mild heroin withdrawal, that it would have peaked before day three. That she was kind of on the downturn. This is not a situation where Ms. Miller was incoherent, in pain, requesting medical attention, unable to move. But to address this question, doesn't Burwell pretty solidly hold that you don't have to correctly diagnose why this is happening? You know, if somebody is continuously vomiting, you know, maybe they get the PSA or a nurse at the facility gets the diagnosis right or wrong. But still, there's a pretty serious medical need. Your Honor, I don't think so. Not in this context. I don't think that there's a serious medical need. Based on the evidence that was submitted and unrefuted, this was simply a mild withdrawal. But what's really important is she did not die because of heroin withdrawal. She did not die because of inattentiveness to the vomiting. She died because she ingested fentanyl. I mean, doesn't Burwell tell us that that doesn't matter? I mean, that's why I'm trying to get you to distinguish that case. That was the same situation. The individual died because he overdosed on some other types of drugs. Right, but there was no causation here. Causation ultimately for damages, ultimately for making out a 1983 claim is one thing. But what we're looking at here with qualified immunity, which we may or may not have jurisdiction over, is a question of did Ms. Miller receive care compliant with the 14th Amendment. It doesn't have to cause her death or not in that context. We'll ask later on in a 1983 analysis if you have causation and damages and things. But for qualified immunity, we're asking whether she got adequate care consistent with the Constitution. I think what we're asking for is was there a serious medical need? And was there proof that my client, Julie Green-Hernandez, consciously disregarded that, turned a blind eye to that? And I don't think there's evidence, even assuming that vomiting known to be associated or reasonably, I guess, associated with the heroin withdrawal is a serious medical need. And even assuming that fentanyl overdose, which I believe it is, is a serious medical need. There's no evidence on this record that my client knew that this was a serious medical need based on the case law that existed and that she turned a blind eye to it and failed to provide medical attention. And then that failure to provide medical attention caused the decedent's death. And I think that's really what's key here, is that there's no, under Farmer, it just doesn't meet the Farmer test. Farmer changed back, I'm sorry, Lawlor changed back the second component of it. Recklessness is not enough. It has to be a conscious disregard. And that's where the video comes in. Everything displayed in that video shows the opposite of deliberate indifference. It shows care. It shows compassion. It jives with her testimony, with my client's testimony, that she went to the Was there like a two-hour period where she didn't check on the client? It's not her. She's not the only one working. She works in a partnership. Someone has to make a cell check every 30 minutes. She doesn't have to make a cell check every 30 minutes. And there were documented cell checks by PSA Hirsch. It's not required that every, you know, there's two of them working at a time. And there's nothing to dispute that PSA Hirsch made those checks. And if he made those checks, and she's laying down. Did the district court credit that Hirsch made those checks? I don't know that the district court did. If the district court construed it the other way, would you concede for the to accept that Hirsch made those checks? Yes. But if Hirsch didn't make the checks, that doesn't mean that it was incumbent upon my client to make the checks. My client only knew what she knew. And what she knew is consistent with the video. That she gave her what she asked for, that Ms. Miller can be seen taking the wipes to clean her cell, moving around about the cell. Not well, but you can see her hand come and take it. You can see her moving. She was rational. She was asking for things. She was complaining about the length of time that she was being detained. She was given juice. Then when she came back, you know, she was laying down. Laying down is consistent with what inmates do. It's boring, you know. And it's after lunchtime. There was nothing in that that was to suggest that there was a serious medical need. And certainly nothing to suggest that she had consumed fentanyl. Thank you, counsel. You have your four minutes. Thank you. Thank you, Your Honors. Christopher Desmond from Johnson Law on behalf of the plaintiff, Stephen Gilman, as personal representative of the estate of Megan Miller. I want to also start with this issue of jurisdiction because I just heard a lot of factual argument, including this idea that there's a question of whether the cell checks occurred. Or, more than that, an assertion that the cell checks did occur. What the district court found is that there isn't evidence that those cell checks occurred. There were notations made in a record indicating that there were cell checks. There's no video evidence of it. And more specifically, we have the EMS report. EMS arrives at Ms. Miller's cell, I believe, at approximately 328. They state that they were told when they arrived that there had not been anybody to see Ms. Miller since 1230 p.m. That's consistent with the video evidence that we've seen. And it's, of course, I believe, at that 1230 p.m. check where Ms. Miller had asked for paper towel to clean up the vomit that was in her cell. And so there's certainly a conflict in this record, as the district court recognized, which I do think divests this court of jurisdiction. Mitchell V. Forsyth from the United States Supreme Court is very clear that while governmental defendants are afforded an opportunity to have interlocutory appeals from a denial of qualified immunity, this court's review is limited to questions of law. And so if we were here because they were conceding the record and saying under this record the law simply does not hold my client liable or my client is entitled to qualified immunity, that would be a different question. But that's not the question that's currently before the court based on the way the defense has positioned this appeal. What's your position? Your print on the other side says that your client was, you know, not the only one who had responsibility to monitor the cell from, you know, 1230 to 320 or whatever that time period was. Hirsch and others may have had. What is the impact of that argument? Frankly, I don't understand it, Your Honor. It's a joint responsibility certainly. Now, one thing to remember, first of all, is that Hirsch, who's the other PSA who's on at that time, Hirsch's shift started at noon, whereas Green-Hernandez's shift started at 7. And so she has a different level of information to begin with. But this was already resolved in the disciplinary hearings when Green-Hernandez asserted that she didn't violate any policies. And they said not only did you have to do checks every 30 minutes, you and Hirsch, not only was it every 30 minutes, because you knew that there were medical needs involved and this was someone who was exhibiting signs of illness, it had to be every 15 minutes under our policy. It's why she was suspended for 30 days without pay as a result of the conduct involved here. And so her employer and the policies that we have in our brief, the policies that she was found to violate, certainly don't say you can just rely on Hirsch. It says that she has an affirmative obligation under their policy to make sure that checks were happening every 15 minutes, and there's no evidence that she did so. In fact, the record seems to indicate that at a bare minimum, there's a 2-hour and 21-minute gap. So EMS says that according to their records, 12.30 was the last time anybody saw Ms. Miller. Video evidence seems to indicate that at 1 o'clock, Green-Hernandez goes back to that cell. But from 1 o'clock until 3.21, nobody, according to this record, it's at least unclear based on this record, whether or not anybody went to go see my client during that 2-hour and 21-minute gap. We know when they go to the cell at 3.21, there's fresh vomit on the floor, meaning that she had been vomiting during that window, not simply before the 1 o'clock window when Green-Hernandez was there. Besides for the cell checks, are there any other material facts that you feel like your friend on the other side is disputing that would divest us of jurisdiction? I think the cell checks are the primary one. I think the idea of there being movement from my client is another one. I think that it's always interesting to me in a deliberate indifference case when credibility, first of all, to me, is so key when you're dealing with anything that involves state of mind and knowledge, right? In a criminal case, if someone comes in and says, I didn't possess the requisite intent, we don't simply dismiss that criminal case. We say, well, that's a question for a jury to consider. I think the same has to be true here. She can say, I saw a foot move, but it's for a jury to consider in the light of all the other record evidence. So I think that that is important. I'm not certain because it didn't come up at oral argument today. I'm not certain that there's been a concession regarding whether or not my client denied the offer of medical care. I know that that's something that had been disputed below. Green-Hernandez had testified, so my client had asked for paper towel to clean up her vomit. I think there was testimony from Green-Hernandez that she offered medical care and my client denied it. I'm not sure that that's been conceded for the purposes of jurisdiction here. Can I ask, how does, from your perspective, how does Lawler impact the way we resolve this case? I don't think it does, frankly, Your Honor. I think that there's going to be certain cases, a small line of cases, where the lack of the benefit of the Helfenstein analysis impacts their ability. We've got a short window where certain clients under the 14th Amendment are apparently going to be subjected to the Farmer Standard. I think under the Farmer v. Brennan Standard, we still prevail in this case. Farmer v. Brennan talks about how when a medical need is obvious, that that satisfies the requirements under the 8th Amendment or the 14th Amendment to the extent that Farmer applies to the 14th here. We have case law from this circuit, and I believe it's the Blackmore case, which the district court cited to, that talks about how vomiting is a sign of internal medical distress or internal medical emergencies, medical needs. I think that even under that Farmer Standard, we survive. I would say, and I don't think that this is the direction that this court should go in, because I think that the record is clear that this is rife with credibility issues that necessitate trial. But this court, and I didn't have an opportunity to brief it because it was post my briefing. This court in a case called Little, I think it's v. City of Morristown, Little v. City of Morristown, and this court's case number is 23-5302. After Lawler came out, they said because the district court in this case didn't have the benefit of Lawler, we're not going to reverse. We're going to remand so that they can consider under the Lawler Standard. So I think at best, defendant can urge this court to remand for that consideration, but I don't think that this record supports it. Not unless they're going to make all of these factual concessions that I don't hear them making at this point. Very briefly, Your Honors, unless there are any other questions, I'd like to note that when it comes to the idea of the Burwell case, Judge Mathis, I think that you're correct in that there doesn't have to be a specific diagnosis or a clear diagnosis on the part of the defendant. They don't have to perceive what the precise medical need is that's at issue. This isn't a medical malpractice case. These cases are treated differently than that. Pharma doesn't talk about the idea that you need to know the precise nature of the emergency. It just talks about how when there's knowledge of an emergency and someone is in the custody of the government and doesn't have an ability to help themselves, they can't get that medical care that they need. Pharma wasn't a medical case, but it was a case where that inmate couldn't resolve the emergency that they were facing. It's incumbent upon the defendant to do so whether they know the precise nature or not. Blackmore doesn't state that vomiting caused by fentanyl is serious, but vomiting caused by heroin is not. It talks about how vomiting is evidence of a serious medical need. I don't think that that argument is availing for the defense. Does the fact that Ms. Miller died of a fentanyl overdose, does that impact your state law claim? Because it seems like state law requires that the deliberate indifference be the proximate cause. It seems here that the proximate cause is the overdose. I don't think it does, Your Honor, first of all. I also want to note, since you raised the issue of fentanyl, you know, it's interesting because my client comes in, they do three different checks of my client's searches of her person. She reveals to them, I'm a heroin addict who recently took heroin. She tells them I have needles, syringes in my possession so that they can take those needles from her. She doesn't say anything about fentanyl. They don't find fentanyl, and there's no evidence in the video or from anybody that says that they saw her take fentanyl. So I know that there's evidence in this record that she died as a result of a fentanyl overdose. Isn't it pretty unrebutted evidence? I mean, we have expert evidence on one side here, and the district court says, you know, there's nothing to rebut this. Unfortunately, that is what the district court said. I think that there was an expert that may have been stricken on the side of the plaintiff below, and so that leaves that unrebutted as of now. I just think that it's notable that it's very unclear. It's unrebutted for summary judgment purposes, you know. Sure, Your Honor. It's in the record to support the plaintiff. Right, but again, I don't think that that hurts us in any way on the deliberate indifference claim. When it comes to the state law claim, you know, the case that they cite to in their brief, it was my case in the Michigan Supreme Court. It's a case called Ray v. Swagger. I view that case very differently than they do. If this court looks at it, Ray was actually a case that walked back the standard that exists in Michigan that was established in a case called Robinson v. City of Detroit. Robinson v. City of Detroit is the first case that talks about this idea of the proximate cause. Ray, what Ray does very significantly, Ray reversed a grant of summary disposition in favor of the defendants in favor of a remand to the trial court in Michigan, the circuit court. What Ray said was that there are multiple factual causes that have been advanced in this case, and Ray, my client, was a student who was waiting at a crosswalk during a cross-country practice when he saw traffic approaching. His coach ordered him to run across the street. When he did, he was struck by a car. And the defense said, well, the proximate cause is the car that hit him, his own choice to run across the street, but it wasn't the coach, couldn't be the coach. The Michigan Supreme Court said, no, that's something that has to go back to the court because you've got to consider the conduct of everybody involved here. And so if it's true that my client ingested fentanyl, and if that's what we have to accept for this record, well, what they have is an addict on their hands who comes in who admits that she's an addict. I think it's odd, personally, when you juxtapose this idea of jailers are responsible for providing medical care in the face of a medical emergency, but then saying your very medical emergency was the cause of your death, right? It removes us one step away from saying, well, it's not my fault that the client died. It's the client's heart. It's the client's conduct in being unhealthy when they came to us in jail to begin with. And so I think that that's a very odd analysis. It certainly isn't the type of analysis or the type of situation that Ray or Robinson or any of that Michigan case law speaks to. We determine, if we were to determine that we don't have jurisdiction over the appeal of qualified immunity for the federal 1983 claim, how does that affect our jurisdiction over the state law immunity? It's a good question, Judge. It's not one that I'd thought about. My assumption was that if this court lacked jurisdiction on the federal issue, there wouldn't be any reason for this court to take pendent jurisdiction over the gross negligence claim, that it would be a dismissal completely. I guess I can't recall seeing a situation where this court would have dismissed the one claim that it did have proper jurisdiction over and then kept a separate claim. I'm trying to imagine, for example, like a Monell situation. If you didn't have jurisdiction over the one and then you kept pendent jurisdiction over Monell, that's not subject to a right to an appeal. I can't remember seeing that situation before. My thought would be that if this court doesn't have jurisdiction, and I don't think that it does, that a remand would be proper. Judge Coyle, I know you were on a panel of mine. We didn't get to see each other at oral argument, but you were on a panel of mine a couple months ago in the Patrick Leoya case, which was a case that was dismissed for lack of jurisdiction. And it was another case where we had, it's a different type of case, it's an excessive force case, but it was a case where we had video evidence that the defense was trying to rely on saying, look at this video evidence, or in this case, look at these log books saying that visits occurred that aren't confirmed by the video. And this court in Leoya, after oral argument, dismissed for lack of jurisdiction, saying this isn't something that we should be properly resolving at this stage. I think that remains true in this case as well. Unless the panel has any other questions, which I'm happy to answer, I'll rest on my brief for the remainder. Thank you, counsel. Thank you, Your Honor. What I heard was a lot about knowledge of a medical emergency. And I submit to this court, there's nothing in this evidence to show that Julie Green Hernandez had knowledge of the medical emergency that caused Ms. Miller's death. She had no knowledge of the fentanyl that apparently Ms. Miller had secreted on her person and brought into jail. She's unfortunately the last person to, she came and she rushed in and did that cell check at 320 and saw her dead. So she becomes, unfortunately, the city's scapegoat. And the policy violations, we essentially had to refute those to the testimony of the investigators who found no actual evidence. Somehow this was like a cobbled together investigation and she was scapegoated. But that is not what happened here. I heard from brother counsel that EMS got information from some hearsay source that the last time she was checked on was at 1230. We know that the video evidence shows that not to be the case. So why should we, the video clearly shows that she was there three times between 1230 and 1 o'clock and she made those checks. And yes, she did not record those checks, just like she didn't record the check at 130. The video shows that she was there between 130 and 3 o'clock? No, it shows that she was there three times between 1230 and 1 o'clock. Okay, but after 1 o'clock? No, it doesn't. It does not show that. But there was nothing, this was not, she had no knowledge that this tragedy was going to befall her. Perhaps, I don't know why she was the only one named as a defendant in this case. Perhaps plaintiff's counsel's better argument would have been to sue the individuals who searched her over and over again when she was brought into custody or placed her in the cell. But on day three, when based on our expert's affidavit, her heroin withdrawal should have been tapering off. There was nothing to suggest to this poor, you know, this poor PSA who had gotten only information about prior vomiting, but no, like there's a supervisor there, if the protocol should have been changed to 15-minute cell checks, or she should have been placed in a detox cell, or something else would have happened, that would have been recorded. She was relying on what she knew, and that was that there was prior vomiting related to heroin withdrawal. Had no knowledge of what could befall her based on the fentanyl that she had secreted herself. And that's basically it. And I do think causation is an issue in a 1983 case in order to give liability. And with respect to the state claims, Ray v. Swagger has been extensively briefed, but it still remains that the plaintiff has to show cause and effect and proximate cause. And proximate cause has been defined as the most immediate, direct cause, and that was her ingestion of the fentanyl. Thank you, Counsel. Thank you for your arguments and your briefs. Your case will be submitted.